MARTIN L. D'OOGE, trustee, *vs.* ALFRED LEEDS & others.

Hampden.     March 12, 1900. — September 21, 1900.

Present: HOLMES, C. J., KNOWLTON, MORTON, LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Distribution of Surplus to Shareholders of Joint Stock Association — Will — Tenant for Life and Remainderman — Capital and Income.*

The surplus of a joint stock association organized under the laws of the State of New York, which was held and used under the requirements of the original articles of the association as a fund "to protect the shareholders and provide for losses," and the income of which it had divided among its shareholders from time to time, together with the earnings of the original capital, was distributed by vote of the managers to the shareholders by issuing bonds equal in amount to the capital stock of the company. The bonds contained no binding contract by anybody to pay anything. They merely gave the holder a contingent right to be paid out of the securities which previously had been held by the company, and which were transferred to the trustee with a proviso that they should be held by the new trustee as they had been held by the trustees of the company,

for the security and indemnification of the shareholders against personal liability for the debts of the company; and payments were to be made to the bondholders only from such proceeds of the securities as should be applicable for the purpose, after provision was made for the payment of all other debts of the company. *Held,* that the bonds were like an issue of preferred stock, and that, as between tenant for life and remainderman, they were capital and not income.

PETITION to the Probate Court by the trustee under a will for instructions as to the disposition of certain bonds and a sum of money. A decree was entered, to the effect that they were income of the trust fund; and an appeal was taken. *Knowlton,* J., reserved the case for the consideration of the full court. The facts appear in the opinion.

The case was argued at the bar in March, 1900, and afterwards was submitted on briefs to all the justices.

*W. W. McClench,* for Alfred Leeds, a remainderman.

*G. A. Bacon,* for William B. Sargent, the life tenant.

KNOWLTON, J. The petitioner is a trustee under the will of Elizabeth Lambert, by the residuary clause of which she directed him to hold three-sixths of the residuum as a trustee, and to pay over the income of it to certain persons for life, and on the death of the last survivor of them to pay over the principal to certain persons and corporations to be held by them absolutely. A part of the property which has come into his hands is twenty-two shares of the capital stock of the Adams Express Company. This company is not a corporation, but a joint-stock association organized under the laws of the State of New York and having a capital stock divided into transferable shares. It had accumulated from earnings a surplus amounting to more than twelve million dollars, which it had invested in securities and property, the income of which it had divided among its stockholders in cash dividends from time to time, together with the earnings of the original capital. On the ninth day of February, 1898, the board of managers of the company voted to distribute its surplus to the amount of $12,000,000 among its shareholders, by issuing bonds equal in amount to the capital stock of the company, in denominations of $1,000 and $500, so that each shareholder should receive in bonds an amount equal to his capital stock. Under this vote, the petitioner has received two bonds of $1,000 each, and $200 in money the proceeds of his fractional interest in another bond, and the question is whether they are to be

turned over to the life tenant as income or are to be held as a part of the principal.

Ordinarily when a testator leaves property to a trustee, the income of which is to be paid to one for life and the principal paid to another after the death of the life tenant, it is the duty of the trustee to take the whole property and use and invest it as a single fund, of which the income only is to be paid to the life tenant, and the principal is to be held for the remainderman. If the property, or a part of it, is of a kind which under the law is controlled and managed by another, so that the trustee can receive into his hands only what the managers turn over to the owners of the beneficial interest, questions of difficulty sometimes arise in determining whether the receipts are income or principal. There is much confusion in the decisions on these questions in the English courts. The judges apparently have desired to take the property as a whole and as the testator is supposed to have known it, and treat it as a single fund, that is, as capital, when the will takes effect upon it, and then determine whether that which afterwards comes into the hands of the trustee is income from it, or is a part of the principal fund. The questions have most often arisen in connection with property in corporations. In reference to such property, the rule in Massachusetts is now well established. Everything is made to turn upon the action of the corporation. " A simple rule is, to regard cash dividends, however large, as income, and stock dividends, however made, as capital." *Minot* v. *Paine*, 99 Mass. 101, 108. *Daland* v. *Williams*, 101 Mass. 571. *Leland* v. *Hayden*, 102 Mass. 542, 550. *Rand* v. *Hubbell*, 115 Mass. 461. *Gifford* v. *Thompson*, 115 Mass. 478. *Adams* v. *Adams*, 139 Mass. 449, 452. In considering the distribution to determine its character, substance and not form is regarded. The simple question in every case is whether the distribution made by the corporation is of money to be spent as income, or is of capital to be held as an investment in the corporation. While this arbitrary rule may sometimes defeat the intention of the testator, in most cases it accomplishes the result intended, and there were practical considerations as well as principles which required the adoption of it. The property of a corporation, in whatever way obtained, belongs, in the first instance, to the corporation and not to the stockholders. It

may be used and managed as the interests of the corporation require. Sometimes it is desirable to divide the greater part of the earnings as income as soon as they are received. Sometimes it is important to retain large accumulations of earnings as additions to the original property and to make them a part of the permanent capitalization. Often it is desirable to keep in the business a large surplus to provide for losses or other contingencies which cannot be foreseen. For these reasons, as well as because of ownership, it is well that corporations should be permitted to determine for themselves how much of their earnings they will divide as income and how much they will retain as capital.

Courts have often suggested the desirability of ascertaining whether the distribution in question is from a surplus accumulated prior to the creation of the trust, or from one accumulated during its continuance. Many decisions in England have been affected more or less by this consideration. See *Bouch* v. *Sproule*, 12 App. Cas. 385, and *Sproule* v. *Bouch*, 29 Ch. D. 635, and cases cited. But in Massachusetts, and we think now in England, it is held to be impracticable in most cases to conduct such an inquiry in the courts with justice to the parties. It would often be impossible to tell what part of an apparent surplus on hand at a particular time was needed for the protection of the capital, or to determine just when the surplus was earned. The conditions which create expenses often come into existence a long time before the expenditures are made, and the returns of one period are often the fruit of effort or outlay made long before. In cases of corporations, therefore, our court does not inquire further than to ascertain whether the distribution is of money to be used as income, or is of capital to be continued in the business. This, too, is the rule in the Supreme Court of the United States. *Gibbons* v. *Mahon*, 136 U. S. 549.

In the present case, although the Adams Express Company is not a corporation, it is like a corporation in the management of its property and business. The stockholders are all liable as partners for the debts of the company. But under the articles of association the business of the association is conducted and governed by a board of managers consisting of nine persons. The property and effects of the association are in the possession

and custody of the trustees, consisting of the president and two other managers who hold the legal title, and dividends are to be declared by the managers to such an extent as they may from time to time determine. It was also provided in these original articles that each share should be subject to the payment of assessments as might be necessary in cases of loss, and that " a fund should be created out of the surplus profits of the association to protect the shareholders and provide for losses." The proceedings of the company, which are before us, show that at the time of the distribution this surplus, to the amount of more than twelve million dollars, was being held and used under the requirements of the original articles of association as a fund " to protect the shareholders and provide for losses." In that way it was used in the business according to the original intention of the shareholders and according to their contract, as much as any part of the capital. It had been invested for the most part in long-time bonds and in good income-producing stocks and securities, a schedule of which is before us. The case finds that the income from these investments was divided among the shareholders from time to time, together with the other earnings of the capital. So this fund was performing a double function, as a part of the permanent property of the company which had been thus capitalized in accordance with the articles of association. The condition as to these earnings was like that referred to by Chief Justice Chapman in *Minot* v. *Paine*, 99 Mass. 101, 107, when he says: "It is obvious that, if the directors had made no stock dividend, but had invested the income in permanent improvements, making no increase of the number of shares, the improvements would have been capital, belonging to the legatees in remainder." It was like that referred to by Lord Herschell in *Bouch* v. *Sproule*, 12 App. Cas. 385, 393, only that the capitalization was express and more complete. He says, " I think the decision in *Brander* v. *Brander*, 4 Ves. 800, proceeded on the ground which Lord Justice Frye accurately states as the foundation of the judgment in *Irving* v. *Houstoun*, 4 Paton Sc. App. 521, viz., that the accumulated profits had become part of the floating capital of the concern. But they had become so, not by reason of any declaration of the company that they should be so, but only in

the sense that, having accumulated, they were, *de facto*, used as part of its capital. In this sense, however, all accumulated profits which are in use for the purposes of the business of any company, may equally be said to form part of its floating capital."

It is to be noticed here that we have no such question as often arises between partners as to what shall be called capital and what income, when by their contributions to the capital, or by the terms of the partnership articles, their proportional shares of the income are different from their shares in the capital. Such questions arise when a partnership business is closed and the partnership affairs are settled, or at any earlier time when there is a division of the profits. In reference to such a question the rule is that everything in addition to the capital contributed by the individual partners is income ; but the question in reference to the rights of life tenants and remaindermen is, What part of the property is held in the business as a fund to be used for the benefit of the business, and what part is permanently separated from the business and turned over to the individual proprietors as income to be spent?

In this company each shareholder is entitled to the same share of the income as of the capital. Like the directors of corporations, the managers under these articles of association have the power to determine what dividends shall be declared and distributed as income, and what part of the earnings shall be retained in the business and used as capital. So far as concerns the question now before the court, we see no reason for treating this distribution differently from a distribution of a similar kind made by a corporation.

This property, having been in the business on February 9, 1898, to be kept and retained like the original capital for permanent use there, was owned by the trustees, and the beneficial interest of the shareholders in it was represented by their certificates of stock. When these bonds were issued, what occurred? First, there was a change of form in the ownership, so that each shareholder had, as evidence of his title, bonds for a part and his original certificates of stock 'for the rest. His actual title was neither less nor more than before. His ownership was divided so that either part could be trans-

ferred without the other, and different attributes were given to different parts of the property. The bonds contain no binding contract by anybody to pay anything. They merely give the holder a contingent right to be paid out of the securities which previously had been held by the company, and which, to the amount of twelve million dollars, were transferred to the trustee with a proviso that they should be held by the new trustee, as they had been held by the trustees of the company, for the security and indemnification of the shareholders against personal liability for the debts of the company. By the terms of the transfer payments can be made to the bondholders only from such proceeds of the securities as shall be applicable for the purpose, after provision is made for the payment of all other debts of the company. The bonds issued to the shareholders are like an issue of preferred stock. The interest is to be paid to the holders, if payment can be made without imperilling the interests of the shareholders who are to be protected from their liability for the debts of the company. On winding up the affairs of the company the principal is to be paid them in full in preference to the claims of common stockholders, if the proceeds of the securities are enough for the purpose. As compared with the common stock, these bonds give greater security; but the dividends can in no case exceed four per cent, while the dividends on the common stock are limited only by the amount of the earnings. If this company had been a corporation and had wished to make a dividend of preferred stock to its shareholders it would have done it in just this way. There has been no dividend of any money or property among the shareholders. There has been merely a change of the form of the ownership in the property, by dividing it into two classes and by making a different provision in regard to dividends for each class, and by giving one class a preference over the other in its right to the assets on final liquidation. Not a dollar's worth of the property of the company is taken out of the business or changed in its relation to the business. While the legal title is in a new trustee, the management of all these securities is retained by the managers of the company, subject to certain provisions for the protection of the bondholders.

That the principal represented by the so called bonds is to remain as an investment in the company and to be used as capital is too plain for discussion. The bonds give only a contingent, equitable interest in certain property of the company. By their terms they are to run for fifty years, which is as long a time as the company is to continue in existence, unless some new arrangement is made. The very nature of the bonds presupposes that as an investment they are to be as permanent as the capital stock of the company; for by their terms they cannot be paid until the debts of the company are all provided for, not only the debts existing at any particular time, but the debts that may be contracted so long as the company continues in existence.

That it was contemplated that the bonds and the original stock should continue contemporaneously as investments, and that the two kinds of holdings in the company should terminate at substantially the same time, is further shown by the facts that the bonds are made payable on March 1, 1948, and that the managers recommended an amendment of the articles of association, which we suppose has been adopted, so as to read, " The association shall continue until July 1, 1948, unless otherwise dissolved by law, or according to these articles."

It is plain that the action of the company was like making a dividend of preferred stock. It was a more formal capitalization of earnings which previously had been capitalized in substance and effect. Applying the rule by which the court is governed in such cases, it follows· in the opinion of a majority of the court, that these bonds must be held by the trustee for the benefit of the remaindermen, as the property which they represent was held before the change.

It is apparent that these earnings had all, or nearly all, been accumulated before the will took effect, and had been treated as capital, and that the testatrix had been receiving income from them in her lifetime. She must have expected that her entire property in this company would be treated by her trustee as principal, which, after payment of the income, would be preserved for the remaindermen.

*Decree accordingly.*