**William Bross Lloyd and Henry Demarest Lloyd, Trustees, Appellees, v. John Bross Lloyd, Individually and as Trustee, Appellant.**

Gen. No. 32,980.

Opinion filed April 30, 1929.   Rehearing denied May 13, 1929.

REILLY and HARROLD, for appellant.

SCOTT, BANCROFT, MARTIN & MacLEISH, for appellees; JOHN E. MacLEISH, LELAND K. NEEVES and FRED SCHROEDER, JR., of counsel.

MR. JUSTICE BARNES delivered the opinion of the court.

This is an appeal from a decree adjudging that $253,750 received by the trustees under the deed of trust here involved constituted funds which were part of the *corpus* of the trust estate and did not constitute income payable to appellant, the life beneficiary.

The trust is a voluntary one. The *corpus* constituted property which belonged to appellant, John Bross Lloyd, in his own right prior to its creation. The trust deed, dated June 19, 1913, provides:

"The trustees shall pay over the net income of said property or so much thereof as said John Bross Lloyd requests, for his maintenance, support, education and enjoyment at convenient intervals not exceeding (3) months apart."

Included in the trust property at the time of the creation of the trust were 125 shares of the Tribune Company. Said company was organized under a special charter in 1861, and throughout its entire existence has had a capital stock of $200,000, divided into 2,000 shares of $100 each.

When said trust was created the Tribune Company owned a plant and office building located on property it held under leaseholds at Madison and Dearborn streets, Chicago. The building was erected in 1902, and took the place of a previous building owned by the company on the same site. It was originally twelve stories in height and subsequently was increased to seventeen. Part of it was used by the company itself and part was rented for revenue purposes, the proportion being about half and half.

In 1920 the Tribune Company erected what is known as "The Tower Building" on Michigan avenue, and by 1925 had substantially completed the removal of its plant from the Madison and Dearborn site to the Michigan avenue site. It then disposed of the Madison and Dearborn site, building and leaseholds, and distributed the proceeds of the sale to its stockholders pursuant to the following plan adopted and affirmed by its stockholders and directors.

It first arranged with one Stone and one Keplinger for a sale of the property at $4,060,000. A new corporation—the Dearborn and Madison Building Corporation—was then organized and the property was conveyed to it for 40,600 shares of its capital stock. These shares of stock were then divided in the form of a dividend of the Tribune Company pro rata among its stockholders, and, as contemplated by the original scheme, Stone and Keplinger purchased directly from the Tribune stockholders at $100 a share the stock of the new corporation so distributed. In such distribution the trustees of this trust received 2,537½ shares of the stock of the corporation for which they were paid by said Stone and Keplinger $253,750 in cash. Whether said stock or the cash received therefor by the trustees constitutes *corpus* of the trust estate or income is the question which the bill filed by the trustees herein seeks to determine. If the former, it undoubtedly belongs to the remaindermen, if the latter, it belongs to appellant, the life tenant.

The foregoing method of procedure and distribution was had pursuant to resolutions by both the stockholders and the directors of the Tribune Company that when a conveyance had been consummated and the stock of the building corporation received by the Tribune Company it should be reissued and delivered to the stockholders of the Tribune Company pro rata according to their respective holdings "as a dividend

. . . out of the last accumulated earnings of this corporation.''

In contending that such dividend constitutes income, appellant not only urges that it must be determined from such action by the company and that it is conclusive, citing cases adopting the Massachusetts rule hereinafter referred to, but contends that regardless of the rule the following facts support that conclusion.

On the books of the Tribune Company the $4,060,000 was charged against surplus. Of that sum $2,486,-857.12 was charged as profit on the sale of the building. Exclusive of such profit the books disclosed that the net profit of the year 1925, when the distribution was made, was $6,042,255.93. At the end of that year only the unchanged capital of $200,000 stood charged as such, and $14,999,080.71 was charged against surplus. In the same year the Tribune Company declared another cash dividend of $2,400,000. Even had there been no such sale a cash dividend for the same amount as the stockholders realized therefrom would not have exhausted ''the last accumulated earnings of this corporation'' nor have entrenched upon its capital.

On the other hand, appellees contend that whether the surplus was large enough to pay such a dividend in cash is entirely immaterial as the distribution was in fact of proceeds derived from the sale of the company's building and leaseholds, and that whether the dividend thereof was of capital or income must be determined by the facts underlying the transaction, as to which the statement of the directors in taking corporate action is not necessarily conclusive, citing *Robertson v. de Brulatour,* 188 N. Y. 301; *United States Trust Co. v. Heye,* 224 N. Y. 242, 120 N. E. 645; *Heard v. Eldredge,* 109 Mass. 258; *D'Ooge v. Leeds,* 176 Mass. 558, 57 N. E. 1025, and other cases. In this con-

nection appellees stress the following facts: That the ground under the building so sold was held by the Tribune Company prior to the sale under certain long term leases which represented an investment of $162,000; that the company was duly authorized to purchase some of these leaseholds and to pay for the same out of funds in possession of the company; that the balance sheets showed the investment in the building, exclusive of the leaseholds, to be over $1,775,000 on December 31, 1902; that in that year the stockholders by resolution authorized the officers of the company to borrow over $500,000, and the directors provided by resolution that after May 1, 1902, one-half of the surplus earnings should be divided among the stockholders pro rata, and the remaining one-half should be put in the building fund authorized in 1899 which amounted to a little over $520,000 June 30, 1901. The fund, however, had disappeared from the balance sheet December 31, 1902. Whether it went into the surplus or the building in question does not appear, and, is as we think, immaterial. It is urged that the books show that the earnings for the two years, 1901 and 1902, not distributed in the form of dividends were not sufficient to account for the increase in the investment which with leaseholds amounted to approximately $1,775,000, and the cost of the building was brought up to over $2,100,000 by December 31, 1924. Reference is made to the fact that the company had no other printing plant until about 1913, when it acquired other property for its colored press work, and that after the company moved into its new plant on North Michigan avenue it still printed paper in the former building until some time in 1925, when all of the departments except the "Want Ad" department were moved into the new quarters. Presumably, having sold the property, the space for that department was rented.

From these facts appellees argue that the money put into the leasehold and the building was capitalized

and that its character as capital was not changed by the sale and the distribution of the proceeds whether denominated as cash or earnings.

The conflict over the right to dividends as between a life tenant and a remainderman has given rise to a wide variety and difference of opinion (*De Koven v. Alsop*, 205 Ill. 309; 14 C. J., sec. 1255), and has resulted in different rules for determining the question. They are discussed and distinguished by the courts and in textbooks as the Massachusetts rule, the Pennsylvania rule, the Kentucky rule, and the rule of England—which, however, is now the same as the Massachusetts rule (14 C. J., sec. 1263). Some States follow one and some another. This State follows the Massachusetts rule (*Alsop* case, *supra; Blinn v. Gillett*, 208 Ill. 473; *Billings v. Warren*, 216 Ill. 281), as do many other States, and as does the Supreme Court of the United States. (*Gibbons v. Mahon*, 136 U. S. 549.) The leading Massachusetts cases in which the rule is laid down are *Minot v. Paine*, 99 Mass. 101; *Leland v. Hayden*, 102 Mass. 542; *Rand v. Hubbell*, 115 Mass. 461; *D'Ooge v. Leeds*, 176 Mass. 558, 57 N. E. 1025; *Lyman v. Pratt*, 183 Mass. 58. In substance the rule is that whether a dividend is to be regarded as income, and, as such, property of a life tenant, or as capital belonging to the remainderman, "is to be determined by the substance and intent of the action of the corporation" in declaring the dividend, or to use the precise language of the *Rand* case, "as shown by its vote," or as said in the *Gibbons* case, *supra*, "as manifested by its vote or resolution."

That the substance and intent of the action of both the stockholders and directors, as evidenced by their resolutions and vote, were to treat the proceeds from the sale of the building and leaseholds—for which it evidently had no further use in the conduct of its business or as an investment—as income from its accumulated earnings, and to declare a dividend thereof to its

stockholders to be realized by them under the arrangement aforesaid in cash, and thus the same as if it had been declared in the form of cash from said earnings, is hardly open to question. Accordingly, observing the Massachusetts rule, in force in this State, we should treat the dividend as income. As said by Mr. Justice Gray in the *Gibbons* case—which is followed in the *Alsop* case: ''Whether the gains and profits of a corporation should be so invested and apportioned as to increase the value of each share of stock, . . . or should be distributed and paid out as income, to the tenant for life or for years, excluding the remainderman from any participation therein, is a question to be determined by the action of the corporation itself, at such times and in such manner as the fair and honest administration of its whole property and business may require or permit.'' No question of *good faith* or rights of third parties arises in this case. Nor are we dealing here with a stock dividend as was the fact in many of the cases cited in the briefs. The fact that the declaration of the dividend was in the form of stock of another corporation does not affect the question. Had the directors declared a dividend of shares of stock in the Tribune Company there would be no doubt that the dividend would constitute capital. But being stock of another corporation it may be treated as cash as was manifestly intended. (*Old Colony Trust Co. v. Jameson,* 256 Mass. 179, 152 N. E. 52; *Gray v. Hemenway,* 212 Mass. 239; *Gray v. Hemenway,* 223 Mass. 293.)

To go back of the corporate action into the accounts and affairs of the company and attempt to trace the dividend to its origin presents the very difficulties and inconveniences, to avoid which said rule has been adopted. The reason for the Massachusetts rule is that it would be impracticable for the courts, in determining the comparative rights of different persons in a particular share of stock, to go behind the vote of the

corporation and its directors, in order to ascertain how the corporation acquired the funds out of which the dividend was declared. (*Minot v. Paine,* 99 Mass. 101, 111; *Rand v. Hubbell,* 115 Mass. 461; *Coolidge v. Grant,* 251 Mass. 352, 354; *Gibbons v. Mahon,* 136 U. S. 549, 559; *Smith v. Dana,* 77 Conn. 543.) Discussing the question in the *Gibbons* case the court quoted with approval from *Williams v. Western Union Tel. Co.,* 93 N. Y., 162, saying: "When a corporation has a surplus, whether a dividend shall be made, and if made, how much it shall be, and when and where it shall be payable, rest in the fair and honest discretion of the directors uncontrollable by the courts," and whether the dividend "shall be made in cash or property must also rest in the discretion of the directors." (p. 564.) In other words, the determination of the matter is left under the rule to the directors because it is deemed that too much difficulty, uncertainty and inconvenience would attend the practical operation of a test requiring the court to go back of the vote of the corporation and investigate its accounts and affairs in order to trace the origin of the particular fund distributed as earnings.

Appellees, however, cite expressions from some of the Massachusetts cases, which taken by themselves apart from the particular facts of the case where used do not apparently harmonize with the rule in its literal form. In the *Heard* case it was said, "it is more safe to look at the character of the property than at the transaction"; and in the *D'Ooge* case, *supra,* that "the substance and not form is regarded"; and in *Talbot v. Milliken,* 221 Mass. 367, 108 N. E. 1060, that the court always looks at the substance of the transaction rather than at its form, and if in its essence the payment is one out of capital, it is treated as such no matter how it may be denominated. However, when these expressions are considered with reference to the particular facts of the case, they disclose no intention

to depart from the rule aforesaid followed in that State. As said in one of the cases, no difficult process was necessary to ascertain the elements that entered into the dividend. In the *Heard* case it consisted of cash received by the corporation for real estate unquestionably forming part of its capital which was taken under the right of eminent domain. In the *Talbot* case it became necessary to interpret the "vote" which referred to "a distribution" and not "a dividend." In the *D'Ooge* case the property always was capital in the business up to the time of its distribution and so declared to be. The quoted expressions above were appropriate to the particular facts before the court which presented hardly any ground for difference of opinion as to the character of the property distributed. It would be hardly profitable to discuss the distinguishing features of the numerous cases cited.

But even the facts disclosed in appellees' attempt to trace the origin of the funds that went into the building and leaseholds do not reveal that they came from the company's original capital or assets it had capitalized or treated in its books and accounts as capital. The facts are equally consistent with the theory of investment or reinvestment of the company's accumulated earnings. (*Smith v. Cotting,* 231 Mass. 42, 48.) We do not find from the evidence adduced that either the building or the leaseholds were ever carried into the company's capital account, or any other fact by which they would seem to be impressed as capital except the form of the investment, which of itself, however, is not determinative of its character.

However, it is argued by appellees that because it appears without such an investigation that the dividend was for the precise amount of the proceeds from the sale of the building and leaseholds it was in substance a distribution of capital assets. This contention involves the theory that when accumulated earnings were put in the building and leaseholds—as the evi-

dence seems to disclose was the fact—they were capitalized and that "when once capital always capital." (*Hemenway v. Hemenway*, 181 Mass. 406.) Discussing this question and the distinctions in the use of the word "capital" in *Smith v. Dana*, 77 Conn. 543, 553, the court had under consideration the distribution of the proceeds of the sale of an electric light and gas plant which had been operated by a corporation, but was taken over by a city under the power of eminent domain. It said: "The quality and incidents of surplus, however invested or employed, are not the same as those of capital, within the strict meaning of that word," and that while in its strict meaning it may be said "once capital always capital," it is not so of distributed profits or surplus in any form. The court went on to say:

"The manner of utilization may be changed, investments altered, permanent property sold and turned into cash, . . . all at the discretion of the directors, with no such artificial consequences that the assets thus employed change their character as the result of the process. Investment in permanent works does not and ought not to capitalize. Directors can, in their discretion, fairly exercised, withhold profits and employ them in the conduct or enlargement of the business. By the same right they ought to be able to, and can, withdraw from any action which will enable the assets thus employed to be returned to their original condition as funds available for distribution to those to whom they might have been originally divided as dividends. Capital of this kind does not bear the perpetual stamp of capital. It simply constitutes a portion of the corporate assets which are within the discretionary control of the directors, which they may use for the corporate advantage in such ways as have the approval of their judgment, or, if that course seems wiser, cease using and by proper action withdraw from the corporate resources." (p. 354.)

The court went on to say in substance that where invested surplus has been created by the lawful fiat of directors it would seem fair that its return by the same means to its original status should be as possible as its first transition, and that when transformed back into cash and a cash dividend declared therefrom the benefit of that dividend should be dependent upon the final act of the directorate, and that the Massachusetts rule adopted in that case rests upon that proposition.

This clear exposition of the subject seems to us sound and practicable, and a justification of the rule on which it is founded. We shall not undertake to quote from other authorities holding that an accumulated surplus invested in permanent works is not necessarily capital beyond the recall of the directors. Authorities so holding are *Thomas v. Gregg,* 78 Md. 545; *Robertson v. de Brulatour,* 188 N. Y. 301; *Gray v. Hemenway,* 223 Mass. 293; *Bryan v. Aiken,* 10 Del. 1, 86 Atl. 674, 677. The last cited case deems it as settled law that although a corporation has the right to set apart or reserve a portion of its net earnings for a period of years, and treat it as capital, yet when it subsequently divides such net earnings among its stockholders it is a distribution of profits.

We recognize that there is a great diversity of opinion on this subject. But if the Massachusetts rule adopted in this State be adhered to we should give to the vote of the directors the weight it is entitled to under the rule, and there being no doubt as to the substance and intent of their action the dividend must be deemed income. On the other hand, the inconvenience and difficulty in reaching a different conclusion by entering into an examination of the company's accounts and thereby undertaking to trace the dividend to its origin leads to the very conditions which under the reason of the rule justifies its adoption.

No other conclusion would be reached by inquiring into the character of the property at the inception of

the trust, or by discussing definitions of "net, income." The fundamental principle involved is whether there was a distribution or division of earnings, profits or accumulations of the corporation. And we find nothing in the facts of the case that is repugnant to the Massachusetts rule for determining the character of the distribution.

Appellees characterize the dividend as "extraordinary" and cite authorities from jurisdictions which make a distinction between extraordinary and ordinary and current dividends. But we deem the distinction irrelevant. Under the Massachusetts rule the fundamental question is whether it is capital or income. While the dividend is extraordinary in amount it can hardly be deemed extraordinary for the Tribune Company in the sense in which it is characterized as such. The year before it was declared that company declared a dividend of $2,600,000; the year before that for $3,311,000, and the year before that for $3,500,000. In those years it added over $4,350,000 to its surplus and still had a large amount left therein undistributed.

We feel constrained, therefore, to follow the Massachusetts rule and consequently to reverse the decree and to remand the cause for entry of a decree in conformity with the views herein expressed.

*Reversed and remanded with directions.*

GRIDLEY, P. J., and SCANLAN, J., concur.