(No. 24042.—

ADELE VIRGINIA HARRIS WHITING, Appellee, *vs.* ELEANOR WHITING HAGEY *et al.*—(SAMUEL GROSSMAN, Guardian *ad litem*, Appellant.)

*Opinion filed April 16, 1937.*

SAMUEL GROSSMAN, (LOUIS N. GROSSMAN, and BER-
NARD A. STOL, of counsel,) for appellant.

WILSON & McILVAINE, WILLIAM B. HALE, and CALVIN
SELFRIDGE, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Adele Virginia Harris Whiting filed an amended and
supplemental complaint in the circuit court of Cook county
alleging the existence of a trust created by her in which she
reserved a life interest, and prayed for an accounting and
a construction of the trust agreement with respect to whether
certain dividends received by the trustee constituted net
income or capital. By another complaint Mrs. Whiting
sought the same relief in connection with a trust created
by the last will of her mother, Eleanor S. Harris. The
complaints alleged that the plaintiff was the beneficiary for
life of the net annual income of both trust estates and that
her four children and two grandchildren were the successor
beneficiaries of the net income and also the beneficiaries of
the ultimate disposition of the principal of the trusts. The

trustee in each trust filed an answer seeking the instructions of the court. The two actions were consolidated in the trial court, and the consolidated cause referred to a master in chancery. He heard evidence and recommended that a decree be entered in favor of the construction urged by the plaintiff. Objections interposed to the master's report by the guardian *ad litem* of the minor remaindermen were overruled and a decree entered deciding the issues, so far as pertinent to this inquiry, in conformity with the master's recommendations. Upon appeal, the Appellate Court for the First District affirmed the decree. (*Whiting* v. *Hagey*, 287 Ill. App. 211.) Thereafter, the Appellate Court granted a certificate of importance and allowed a further appeal to this court.

The pertinent facts disclosed by the pleadings and evidence are: The plaintiff, Mrs. Whiting, is the life beneficiary under two trusts, each consisting of one-third of the residuary estate of her deceased mother. By her will Eleanor S. Harris, the mother, bequeathed the net annual income from one-third of her residuary estate to the plaintiff for her life and also the net income of another third until the plaintiff attained the age of thirty-five years. Before reaching the designated age the plaintiff elected to create a trust of the corpus she was presently to receive and, by the trust agreement, reserved to herself the income for life. The four children of the plaintiff, two of whom are minors, and her two minor grandchildren are the successor beneficiaries of the net income of the trusts and likewise the remaindermen.

On March 18, 1929, each trust included among its assets 2275 shares of stock of the Continental Illinois Bank and Trust Company, successor by consolidation to the Continental Illinois Bank and Trust Company and the Illinois Merchants Trust Company. Previous to the said consolidation, certain agreements were entered into by the directors and stockholders of the constituent banks which

provided, among other things, for an affiliate securities company to be organized and known as the Continental Illinois Company, and, further, that it should be provided with assets aggregating $20,000,000. At the time the consolidation was completed, the sums of $4,407,700 from the funds acquired by the new bank from excess subscriptions to its capital stock, and $15,592,300, or 77.96 per cent, representing assets traceable to the earned surplus and undivided profits of the constituent banks, were transferred to the securities affiliate. The statement of condition of the consolidated bank at the commencement of business on March 18, 1929, announced the capital of the securities company as $20,000,000 and stated that its stock was owned by the stockholders of the bank. The assets of the securities company were segregated from the assets of the consolidating banks conformably to the provisions of "modified agreements for the deposit of stock," dated September 7, 1928. These assets, when transferred to the securities company on March 18, 1929, were not thereafter carried on the books of the consolidated bank. All of the shares of the securities affiliate were placed in trust for the benefit of the stockholders of the bank, in proportion to their respective number of bank shares. The declaration of trust, dated February 27, 1929, provided that the only evidence of the beneficial interest of any person in the stock of the securities company (apart from the declaration of trust,) should be that given in, and by, an indorsement to be placed upon the back of all certificates of stock of the consolidated bank to the effect that the beneficial interest in the capital stock of the affiliate could not be transferred separate from the stock of the bank. The certificates also bore an endorsement that each share of bank stock carried with it a proportionate beneficial interest in the capital stock of the securities company.

On October 15, 1932, the Continental Illinois Bank and Trust Company of Chicago was converted from an Illinois

banking corporation into a national banking association, under its present name of Continental Illinois National Bank and Trust Company of Chicago. Subsequently, a mandatory provision of the National Banking act of 1933 required that national banks sever their connections with affiliated securities companies, including affiliates existing through control of securities companies by the shareholders of the banks, within one year from the enactment of the law. To comply with the Federal statute the board of directors of the securities company adopted a resolution providing for its liquidation and the distribution of its assets to their owners. The resolution was approved in due course by the trustees of the securities company. On December 20, 1933, the stockholders of the bank adopted a resolution providing that certificates of common stock of the bank, of a reduced par value, and certificates of preferred stock, be issued in such form as might be permitted by law, and that the common stock certificates should contain no reference to beneficial ownership of stock in the securities company. The resolution provided further that the trustees of the stock of the affiliate be requested to take the requisite action to sever the beneficial ownership and transferability thereof from the certificates of stock of the bank. In conformity with the resolution there was delivered to the bank stockholders, *pro rata*, certificates of beneficial ownership in the stock of the securities company entirely independent of the bank stock. After appropriate proceedings for dissolving the securities company had been instituted the bank addressed a letter to the holders of certificates of beneficial interest in stock of the securities company. It recited that the securities company had declared an initial liquidating dividend of $750,000 in cash and 1,000,000 shares of the common capital stock of another company known as Chicago Corporation, to be distributed ratably to the beneficial owners under the declaration of trust of February 27, 1929. The trustee of the Whiting and Harris trusts re-

ceived $4550 in cash and 3033 shares of stock of the Chicago Corporation as the proportionate share of each trust in the assets of the securities company. This distribution was made on the basis of $2 in cash plus one and one-third shares of Chicago Corporation stock for each share of bank stock.

Upon the basis of the foregoing facts the circuit court found (1) that 77.96 per cent of the capital of the securities company was traceable to the earned surplus and undivided profits of the consolidating banks; (2) that the distribution to the consolidated bank's stockholders of certificates of beneficial ownership in the stock of the affiliate constituted a dividend of income upon the bank's stock and, further, (3) that the plaintiff, as life beneficiary of the trusts in controversy, was entitled to receive 77.96 per cent of the liquidating dividend as income and a like proportion from any further distribution of the assets of the securities company. The guardian *ad litem* contends, however, that the transfer of earned surplus and undivided profits of the bank to the capital of the securities company resulted in a capitalization by the bank of such surplus and profits, and that they therefore became part of the *corpus* of the trusts for the benefit of the remaindermen. On the other hand, the plaintiff maintains that although the directors of the bank, with the acquiescence of the stockholders, invested $15,592,300 in the capital of the securities company, they nevertheless later paid or distributed it to the stockholders of the bank, and that since the amount mentioned came from the earned surplus of the constituent banks, the portion of the assets of the securities affiliate represented by this earned surplus, paid out by means of the liquidating dividend belongs to the life beneficiary, because it is a dividend declared upon surplus and earned profits, as distinguished from a distribution of capital.

The principles applicable to the factual situation presented are well settled. The determination of whether cer-

tain dividends go to the life beneficiary of shares or to the remainderman depends primarily upon the intention of the creator of the fund, and the intention, when once ascertained from the language of the will or other instrument, and the surrounding circumstances, must be given effect. (*Gibbons* v. *Mahon,* 136 U. S. 549; *Blinn* v. *Gillett,* 208 Ill. 473.) Neither the will creating the Harris trust, nor the trust agreement creating the Whiting trust, defines net income. The rule which obtains in this State with respect to the right to dividends as between a life tenant and a remainderman in such cases is known as the Massachusetts rule or "the rule in Minot's Case." (12 Fletcher's Cyclopedia Corporations, sec. 5393.) It regards cash dividends whether large or small, as income, and stock dividends, whenever earned and however declared, as capital. Cash dividends, therefore, belong to the tenant for life and stock dividends to the *corpus.* (*Minot* v. *Paine,* 99 Mass. 101; *DeKoven* v. *Alsop,* 205 Ill. 309.) In deciding whether a particular distribution is a stock or a cash dividend, the actual and substantial character of the transaction, and not merely its nominal character, may be considered. (2 Cook on Corporations (6th ed.) sec. 555; *Billings* v. *Warren,* 216 Ill. 281; *Blinn* v. *Gillett, supra; DeKoven* v. *Alsop, supra; Leland* v. *Hayden,* 102 Mass. 542.) When a dividend is declared of stock of another corporation, a distribution of such stock, in its legal effect, ordinarily is like a cash dividend. (*Gray* v. *Hemenway,* 268 Mass. 515, and 212 id. 242; *Leland* v. *Hayden, supra.*) Whether a dividend is to be regarded as income or capital is to be ascertained from the substance and intent of the corporate act declaring the dividend. (12 Fletcher's Cyclopedia Corporations, sec. 5395; *Gibbons* v. *Mahon, supra; Gray* v. *Hemenway, supra; Gifford* v. *Thompson,* 115 Mass. 478; *Leland* v. *Hayden, supra; Lloyd* v. *Lloyd,* 341 Ill. 461.) This doctrine is based upon the impracticability of determining the comparative rights of different persons in a par-

ticular share of stock, of going behind the votes of the corporation and its directors, and of investigating the corporate accounts and affairs, in order to ascertain how the corporation acquired the fund out of which the dividend was declared. *Lloyd* v. *Lloyd supra; Gray* v. *Hemenway, supra.*

Application of these principles to the facts in the case at bar discloses that there was a distribution of earnings, profits or accumulations as income to the stockholders of the bank. More than seventy-five per cent of the capital of the securities company represented earnings in the form of surplus and undivided profits of the constituent banks available for distribution to the stockholders of the two banks as earned surplus at the time of their consolidation. The agreements under which the merger was consummated expressly provided for the withdrawal of this portion of the earned surplus of the banks from the assets of the successor institution and for its investment in the capital of the securities company for the benefit of the new bank's stockholders. The earned surplus of the constituent banks set apart and transferred to the securities company was irrevocably segregated from the assets of the bank and beyond the power and control of the bank to recall the investment as part of its assets. An analogous situation obtains where the corporation which transfers property to a new corporation causes the latter to declare and pay a dividend of its stock *pro rata* to the stockholders of the old company. Dividends declared in such cases constitute income and belong to the life tenant. *Gray* v. *Hemenway, supra; Old Colony Trust Co.* v. *Jameson,* 256 Mass. 179; *Lloyd* v. *Lloyd, supra.*

In *Old Colony Trust Co.* v. *Jameson,* instructions were sought as to whether fifty-two shares of the Electric Bond & Share Securities Corporation, distributed by the General Electric Company to its stockholders, were to be paid to the life beneficiary as income, or treated as capital and

held by the trustees. Shares of the General Electric Company were held by certain trustees as part of a trust fund. That corporation owned all the common stock and three hundred shares of the preferred stock of the Electric Bond & Share Company. The General Electric Company, on December 30, 1924, voted to re-organize by separating from its other assets all of the stock of the Electric Bond & Share Company then owned by it. The Electric Bond & Share Company had been formed by the General Electric Company. It represented an investment of surplus earnings which were carried as a separate investment by the General Electric Company, as shown by its report, and the distribution of the stock was charged against surplus. The re-organization was effected by organizing a new corporation, a holding company, known as the Electric Bond & Share Securities Corporation, to which the General Electric Company transferred all its stock in the Electric Bond & Share Company, and the shares of the new holding company were distributed *pro rata* to the holders of the common stock of the General Electric Company. The resolution of the directors did not state either that the shares of stock of the Electric Bond & Share Company were part of the surplus of the General Electric Company or that they were being paid as a dividend. The fact was otherwise proved. The Supreme Judicial Court of Massachusetts held that the transaction by which the stock of the securities corporation was distributed must be treated as a cash dividend payable to the life tenant. "The form adopted by the directors of the General Electric Company," the court said, "did not make the distribution a distribution of the capital of the General Electric Company. As found by the judge of probate, the desire of the directors to distribute the shares so that they would be held as capital for Federal income tax purposes did 'not change the character of what was in fact done in so far as the present proceeding is concerned.'"

In *Gray* v. *Hemenway, supra,* the Delaware, Lacka-
wanna and Western Railroad Company owned mortgage
bonds of a coal company amounting, at par, to $58,500,000.
The board of managers of the railroad company voted to
adopt a plan whereby the corporation would transfer to a
securities company, a new corporation, a part of its assets,
namely, the bonds of the coal company, together with in-
terest and the mortgage securing the bonds. The securi-
ties company, in turn, was to issue all of its capital stock
*pro rata* to the stockholders of the railroad company in
consideration of the bonds and mortgage. This plan was
carried out, and the resolution of the board of managers
of the railroad company stated that the bonds and mort-
gage were a part of its surplus assets. Their transfer was
charged against surplus on the balance sheet of the rail-
road company, leaving a substantial surplus after the trans-
fer. The number of shares of stock of the railroad com-
pany and its capital were the same after the transfer as
before. In deciding the question whether trustees holding
stock of the railroad company should treat the distribution
of the securities company stock as income for the bene-
ficiaries for life, or capital to be held for the remaindermen,
the court observed: "The dividend in the case at bar in
stock of the Securities Company had the characteristics of
a dividend of income. It diminished the property of the
Railroad Company but left the proportional interest of each
stockholder in remaining corporate property exactly what
it had been before. [Citations.] The stock of the Securi-
ties Company, if retained by the trustees, would not be an
investment in the Railroad Company. [Citation.] * * *
Upon the record there would seem to be no sufficient ground
for reaching the conclusion that the corporation was not
justified in carrying to the surplus account the proceeds of
the coal properties in 1921 and in declaring a dividend from
surplus in 1927. * * * The dividend clearly appears to

have been intended by the corporation as a partial distribution of surplus."

The present case closely parallels *Lloyd* v. *Lloyd, supra.* In the case cited the Tribune Company disposed of a building no longer required in its business by conveying it to a newly organized corporation in exchange for 40,600 shares of stock which were immediately distributed *pro rata* among the stockholders of the Tribune Company as a dividend out of its last accumulated earnings, pursuant to resolutions by both its stockholders and directors. The stockholders then sold the stock to third parties nominated by the Tribune Company for $100 a share. This court held that the money ultimately received by the stockholders was income and that, in consequence, trustees vested with shares of stock of the Tribune Company must pay the cash received to the life beneficiary and not to the *corpus* for the benefit of the remaindermen.

The capital of the securities company, after its segregation from the surplus assets of the bank, formed no part of the bank's capital structure. Later, when beneficial interests in, or certificates of beneficial ownership of, stock were distributed to the stockholders of the bank they were certificates of ownership in the affiliate and not shares of the bank. The Appellate Court, in its opinion, well said: "Even though when the securities company was incorporated no actual dividend of its stock *pro rata* to the bank's stockholders was declared, the declaration of trust of February 27, 1929, in placing all the stock of the affiliate in trust for the bank's stockholders exclusively as part of the plan of consolidation of the constituent banks, manifested an intention to treat the capital of the affiliate to the extent of $15,592,300 as income." Conceding that the stockholders had no right to obtain the surplus while it was invested in the securities company, it does not follow that assets change their character by investment beyond the general power of the directors to alter them. (*Gray* v.

*Hemenway, supra; Old Colony Trust Co.* v. *Jameson, supra.*) Like situations obtained in *Lloyd* v. *Lloyd, supra,* where a building was held by the corporation for several years as part of its surplus assets, in *Gray* v. *Hemenway, supra,* where a corporation carried bonds of a coal company in its surplus for six years, and, also in *Old Colony Trust Co.* v. *Jameson, supra,* with respect to the stock of the Electric Bond & Share Company, proved to have come from the surplus assets of the General Electric Company. The fact that the stockholders of the bank in the present case could not have disposed of their stock interest in the securities company except by selling their bank stock, until the interests of the bank's stockholders in the stock of the securities affiliate were segregated, is immaterial. Similarly, while the shares of the Electric Bond & Share Company remained in the treasury of the General Electric Company, the transfer of shares of the latter company carried with it the interest in the Electric Bond & Share Company. When paid out, although not denominated a dividend, the shares nevertheless constituted income belonging to the life beneficiary. (*Old Colony Trust Co.* v. *Jameson, supra.*) The conclusion is inescapable that the trustee under the two trusts in question obtained the proceeds of the stock of the securities affiliate in substantially the same manner as did the trustees in *Lloyd* v. *Lloyd, supra, Gray* v. *Hemenway, supra,* and *Old Colony Trust Co.* v. *Jameson, supra.* The dividend in controversy was not a stock dividend as in *Blinn* v. *Gillett, supra,* relied upon by the guardian *ad litem,* but was a dividend of stock or the proceeds of stock. In short, in the case at bar there was a distribution of surplus and not a capitalization of surplus.

The investment of $15,592,300 surplus of the constituent banks in the capital of the securities company for the benefit of the bank's stockholders did not impair the capital of the bank. This amount came from earned surplus, and with the additional amount subscribed by the subscribers

to shares of stock of the banks, was segregated. It did not thereafter appear as an asset on the books of the consolidated bank and was never included in any of its published statements as an asset. The guardian `ad litem` argues, however, that the reduction of the par value of the shares of the bank's stock co-incident to the liquidation of the securities company impaired the bank's capital. Manifestly, a decrease in par value of stock of the bank did not necessarily impair its capital. Nor does it tend to prove that the distribution to the shareholders of earned surplus, previously segregated into the securities company, impaired the bank's capital. The subsequent distribution of the surplus in controversy was, in essence, merely the payment of earnings as a deferred dividend to the stockholders of the bank.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*